UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEVIN ADAMS, AS THE ADMINISTRATOR OF THE ESTATE OF SEAN HARRIS,

Plaintiff,

vs.

TOWN OF CLARKSTOWN, POLICE OFFICERS DOES #1-60, POLICE SUPERVISOR DOE #1, DETECTIVE NORM PETERS, ROCKLAND COUNTY, ACCESS SUPPORTS FOR LIVING, ACCESS CASEWORKERS JANE DOES # 1-2, ROCKLAND PARAMEDICS, PARAMEDICS DOES # 1-2, NYACK COMMUNITY AMBULANCE CORPS, EMT KELLY MCHUGH, EMT ROSA LATANZO,

Defendants.

Civil Action No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

By and through his attorneys, Randolph M. McLaughlin and Debra S. Cohen, Plaintiff Kevin Adams, as the Administrator of the Estate of Sean Harris, alleges upon knowledge, information and/or belief as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiff Kevin Adams, as the Administrator of the Estate of his brother Sean Harris, seeks relief for the violation of Mr. Harris's rights, privileges and immunities secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments of the United States Constitution, Title II of the Americans With Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, and the Constitution and Laws of New York State.

2. It is alleged that the Defendants, acting jointly and severally, committed a series of unlawful acts that resulted in the seizure, detention, and use of excessive force against Sean Harris while he was in their custody and control, caused him extreme emotional distress and mental anguish, and failed to provide him adequate medical care.

3. The Defendants actions caused Sean Harris severe physical and emotional injuries and were a proximate cause of his death.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiffs further invoke supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

5. Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred within the district.

## TRIAL BY JURY

6. Plaintiff demands trial by jury on each and every one of his claims herein.

## PARTIES

7. At all times relevant, Plaintiff Kevin Adams was a resident of Essex County, New Jersey and serves as Administrator of the Estate of his brother Sean Harris who was at all relevant times a resident of Rockland County, New York.

8. Defendant Town of Clarkstown (herein Defendant Town) is a duly constituted municipal corporation of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The Town assumes the risks incidental to the maintenance of a police force and the employment of police officers.

9. Defendants Police Officers Does #1-60 were at all relevant times employees of the Town of Clarkstown. At all times relevant to the facts of the Complaint said Defendants were acting under color of law and within the scope of their employment. Said Defendants are sued in their individual and official capacities.

10. Defendant Police Supervisor Doe #1 was at all relevant times an employee of the Town of Clarkstown. At all times relevant to the facts of the Complaint said Defendant was acting under color of law and within the scope of his employment. Said Defendant is sued in his individual and official capacities.

11. Defendant County of Rockland (herein Defendant County) is a duly constituted unit of local government organized under the laws of the State of New York.

12. Defendant Access: Supports For Living (Access) at all relevant times was contracted by Rockland County to provide support services for people facing the challenges of disability and mental illness.

13. Defendants Jane Does #1-2 at all relevant times were employed by Access as caseworkers providing outreach services to residents of Rockland County, including Sean Harris.

14. Defendant Rockland Paramedic Services is the emergency medical services provider for all towns in Rockland County, working in conjunction with the various town volunteer ambulance corps.

15. Defendants Paramedics Doe # 1-2 were at all relevant times paramedics with Rockland Paramedic Service responsible for treating Sean Harris at the scene and transporting him to the hospital.

16. Defendant Nyack Community Ambulance Corps is a 501(c)(3) corporation providing ambulance operations and emergency medical services.

17. Defendant Kelly McHugh was at all relevant times an Emergency Medical Technician (EMT) with the Nyack Community Ambulance Corps responsible for treating Sean Harris at the scene and transporting him to the hospital.

18. Defendant Rosa Latanzio was at all relevant times an Emergency Medical Technician (EMT) with the Nyack Community Ambulance Corps responsible for treating Sean Harris at the scene and transporting him to the hospital.

## FACTUAL ALLEGATIONS

19. On May 30, 2023, at approximately 6:15 p.m. Sean Harris was playing video games in the basement of the home he shared with his mother, Judy Adams.

20. Jane Does 1 and 2, caseworkers employed by Access, arrived for a home visit.

21. Ms. Adams had contacted Access to arrange for them to make home visits to provide support services to her son.

22. The visit by Jane Does 1 and 2 was the third home visit by the agency.

23. But it was the first time either Jane Doe 1 or 2 had been there and the first time either had met Sean or his mother.

24. One of the caseworkers was White and the other Hispanic.

25. Sean and his mother were both Black.

26. Ms. Adams formally adopted Sean when he was five (5) years old but had been his foster mother from the time he was just seventeen (17) days old.

27. Throughout his life, Ms. Adams had ensured that Sean consistently received medical and psychological care to assist and support him with his physical, social and educational needs.

28. Sean and his mother had a very close relationship.

29. Sean's mother knew how to respond when he needed comforting or guidance.

30. Sean was a friendly person but often preferred staying home playing his video games.

31. On the day of the incident, Sean was nineteen (19) years old, 6 feet tall and weighed 229 pounds.

32. After the two caseworkers arrived, they went downstairs to the basement to meet Sean.

33. Judy Adams stood on the stairs to the basement watching.

34. After spending less than one minute with Sean, the two caseworkers returned upstairs.

35. They sat on a couch in the living room talking to Ms. Adams, who sat on another couch.

36. Sean came upstairs and sat on the arm of one of the couches.

37. He began talking to his mother about wanting to order a new cellphone.

38. He was holding a "T-Ball" bat in his hand.

39. The conversation between mother and son was normal.

40. Initially they disagreed about whether she should pay for a new cell phone for him.

41. Nothing about Sean's behavior caused his mother to worry.

42. Shortly after the conversation began, Sean and his mother were laughing together.

43. While they were talking, the two caseworkers had left the house.

44. Standing in the front yard they made a telephone call.

45. Shortly after, police arrived at the house.

46. Police had been to the house before.

47. Ms. Adams had called them on occasion when she was concerned about her son's well being.

48. Each time police came Sean was cooperative with them.

49. Usually, police would speak to him and leave.

50. On a couple of occasions Sean was treated at local psychiatric facilities to stabilize his condition.

51. He complied with his out-patient treatment programs, including attending appointments with mental health providers.

52. On the day of the incident, one of the first officers to arrive asked Ms. Adams to come outside.

53. At the time Ms. Adams stepped outside, Sean had not threatened her nor engaged in any violent acts.

54. After Ms. Adams stepped outside, the police would not allow her to return inside the house where her son was now alone.

55. Ms. Adams asked to be allowed to return inside her home but police refused to allow her to do so.

56. Ms. Adams repeatedly told the police offices her son was not violent and had not hurt anyone.

57. Ms. Adams was kept away from Sean by the police even though she had a lifetime of experience comforting him and successfully redirecting his behavior when necessary.

58. There were no firearms in the home.

59. Ms. Adams told the police of her son's mental health issues and the medications he took.

60. As she stood outside, several more police cars and officers arrived.

61. Police put up yellow crime scene tape.

62. Police surrounded the house on each side, some in the yard of Ms. Adams house and others in the neighbors' yards.

63. Eventually up to 60 police officers, including SWAT officers, came to the location.

64. All of the police officers were white.

65. Initially, police officers, neighbors and family members communicated with Sean while he remained inside the house.

66. Sean initially stood halfway out the front door and appeared relaxed as he talked to a neighbor.

67. Then, less than approximately twenty (20) minutes after police arrived, a police officer who was crouched behind the next door neighbor's car stood up, came around the car and fired a less-lethal "beanbag" shotgun.

68. The projectile(s) fired from the less lethal shotgun struck the glass storm door behind which Sean was standing and Sean in the abdomen.

69. At the time he was shot by the less lethal shotgun, Sean was not a threat to anyone.

70. He had been standing in the front doorway communicating in a relaxed manner.

71. The police officer gave no warning to Sean before firing the less lethal shotgun.

72. Other police officers were in close proximity to Police Officer Doe #1 as he prepared to fire the less lethal shotgun.

73. No officer took steps to intervene to stop Police Officer Doe #1 from firing the less lethal shotgun at Sean.

74. A less lethal shotgun fires its projectiles at a velocity equivalent to a Mike Tyson punch.

75. The objective of firing a less lethal shotgun is to knock a suspect off balance so that the police can take physical control of them.

76. No police officer was close enough to Sean to take physical control of him at the time the less lethal shotgun was fired.

77. Police officers at the scene and Police Supervisor #1 were, or should have been, trained that firing the less lethal shotgun from the distance it was fired, with no officers positioned to take control of Sean, was an improper use of the less lethal shotgun.

78. The only effect would be to cause Sean pain and fear, which it did.

79. After the projectile(s) shattered the glass storm door and struck Sean in the abdomen, he immediately backed up from the doorway, closed the front door and retreated into the house.

80. For a period of time after the less lethal shotgun was fired, Sean could be seen from time to time through the front window walking back and forth within the house.

81. He held a bottle of water in one hand.

82. The front living room window was partially open.

83. The many police officers now outside his home were clearly visible from inside the house.

84. Police asked Sean to come out of the house.

85. He repeatedly refused, at one point saying that he was more comfortable inside.

86. By around 7:00 p.m. at least one police supervisor in a white shirt was on the scene and had taken over.

87. One of Sean's relatives was given a device to try to talk to him.

88. He came to the window and said he wouldn't come out.

89. The police told Sean to come out and talk to them.

90. At some point when the police asked him to come outside to talk to them he said "it's too late for that".

91. During the time that Sean was still visible walking back and forth within the house, the caseworkers Jane Does 1 and 2, who had been standing across the street, both left.

92. Up to this point, from the time they left the house and made a phone call, they made no attempt to communicate with Sean.

93. A female police negotiator arrived at the scene but made no attempt to communicate with Sean.

94. Nor did the police negotiator have any direct contact with his mother.

95. The police negotiator told family members she had to leave her daughter's lacrosse game to come to the scene.

96. The police negotiator did ask other family members who were at the scene if they knew of any reason Sean wouldn't want to come out or would think he was in trouble?

97. They answer they gave her was, "Look around".

98. Police kept asking the family members and neighbors to move farther and farther back away from the house.

99. Sean could be seen from time to time through the living room window, but there came a time after the storm door was shattered that he was no longer seen through the front window.

100. The situation changed about 30-45 minutes after Sean had said "it's too late for that".

101. When a SWAT team arrived, police moved family members and concerned neighbors farther back up the street where they could no longer see the house.

102. Police also stopped communicating with the family as to what was happening.

103. It was now dark outside.

104. The sun had set at 8:21 p.m. on May 30, 2023.

105. Family members at the scene could no longer see what the police were doing at the house.

106. After moving the family back, police had nothing more to say to them.

107. Upon information and belief, after moving the family even farther down the street, police officers with canines made entry into the house.

108. Detectives later told family members that when police entered the house they found Sean unresponsive in the bathroom next to pill bottles.

109. The bathroom was located on the first floor of the home and had a window overlooking the side yard and a nearby neighbor's house.

110. After Sean retreated into the home after the less lethal shotgun was fired, police made no attempt to observe him within the house other than through the front window.

111. During the incident, two ambulances were parked at either end of the street.

112. At all relevant times, Rockland Paramedic Services and the Nyack Community Ambulance Corps worked jointly to provide emergency medical services for all towns in Rockland County, including Nyack.

113. Upon information and belief, paramedics and EMTs from both responded to the Sean Harris incident.

114. Sometime between 9:00 and 9:30 p.m. Sean was removed on a stretcher from the house.

115. Sean was taken to the hospital by ambulance, without lights or sirens.

116. According to hospital records, police advised that Sean was brought to the hospital approximately one hour after he was last seen inside the house.

117. Emergency medical services personnel estimated Sean's "downtime" as 30-45 minutes prior to his arrival at the hospital.

118. During this "downtime" inadequate medical care was provided to Sean Harris to address his condition.

119. During this "downtime", before Sean Harris was taken to the hospital, police searched the home.

120. The distance between Ms. Adam's home and the hospital is approximately 1 mile, a five minute drive.

121. Sometime after Sean was removed from the house, family members were told by police to go to the hospital to see him.

122. At the hospital, family members were told by a doctor that he was dead.

123. According to hospital records, Sean arrived at the hospital in cardiac arrest, pupils fixed and dilated, no spontaneous respiration and neurologically unresponsive.

124. According to hospital records, an abrasion on his lower left abdomen was observed.

125. Sean Harris's time of death was called at the hospital at 22:05:52 (approximately 10:05 p.m.).

126. When family members returned to Ms. Adam's and Sean Harris's home from the hospital there was nothing indicating that Sean had damaged or destroyed any items within the home on the night of the incident.

127. Everything in the home was intact except for some furniture that had been moved in the living room and one missing dining room chair.

128. Everything in the medicine cabinet and bathroom shelf appeared orderly.

129. Nothing was on the bathroom floor.

130. The police conducted a search of the home before Sean Harris was taken from it to the hospital and before the family was allowed back inside.

131. Ms. Adams was never advised what, if any, items police removed from her home following their search.

132. Nor was Ms. Adams ever advised what personal items of Sean were removed by police from the hospital after his death.

133. The following day, Ms. Adams had to clean up the broken glass on her front stoop from the storm door shattered by the less lethal shotgun.

134. Ms. Adams has never received any information, an apology or condolences from the Town, County or agencies involved in the incident that ended with the death of her son.

## FEDERAL CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(42 U.S.C. § 1983 for Violations of the Fourth Amendment)*

135. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

136. Defendant Police Officers Does # 1-60, acting under color of law, violated Sean Harris's right under the Fourth Amendment to be free from unreasonable seizure when he was wrongfully seized and detained in his home without warrant or cause, thus falsely imprisoning him.

137. Defendant Police Officer John Doe # 1, acting under color of law, violated Sean Harris's right under the Fourth Amendment to be free from unreasonable use of excessive force when he shot him with a less lethal shotgun.

138. Police officers Doe #2-60 and Police Supervisor Doe#1 failed to stop Police Officer Doe #1's use of excessive force by firing the less lethal shotgun that struck Sean Harris when they had the time and ability to intervene to do so.

139. Police officers Doe #1-60 and Police supervisor Doe #1, acting under color of law, denied Mr. Harris's right to adequate medical care while detained by them and in their custody.

## SECOND CLAIM FOR RELIEF

*(42 U.S.C. § 1983 for Violations of the Fourteenth Amendment)*

140. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

141. Defendants Police Officers Does #2-60 and Police Supervisor Defendant Doe #1 acting under color of law, violated Sean Harris's rights to be free from the use of excessive force and bodily integrity by encouraging, condoning and failing to intervene to prevent the actions of Police Officer John Doe # 1 knowing he was armed with a less lethal shotgun, preparing to fire it, and did unreasonably use it against Mr. Harris.

142. By condoning, encouraging and/or failing to prevent Police Officer Doe #1 from using the less lethal shotgun, the defendants created and/or increased the danger to Sean Harris of physical and emotional injury.

143. Defendant Police Officers Does #1-60 and Police Supervisor Doe #1, under color of law, violated Sean Harris's right to liberty by surrounding his home and inhibiting his freedom of movement, thus falsely imprisoning him.

144. Defendant Police Officers Does #1-60 and Police Supervisor Doe #1 denied Sean Harris of his constitutional right to intimate association with his mother by directly acting to

isolate him from her, preventing her from providing him the comfort and guidance he needed and that would have de-escalated the situation that was a proximate cause of his death.

145. Defendant Town of Clarkstown by and through its police media contact Detective Norm Peters, acting under color of law, denied Plaintiff's rights under the Fourteenth Amendment to equal justice and access to the courts by releasing false information about the actions of police, the caseworkers and Sean Harris to the press and public in media releases following the incident.

146. Police officers Doe #1-60 and Police supervisor Doe #1, acting under color of law, were deliberately indifferent to Mr. Harris's right and need for access to adequate medical care following their entry into his home and finding him in a serious medical condition by interfering with and delaying the delivery of emergency medical services and delaying immediate transfer to the hospital.

## THIRD CLAIM FOR RELIEF

(Violation of the Americans With Disabilities Act (42 U.S.C. Section 12132) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794(a))

147. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

148. Defendant Police Officers Does #1-60 and Police Supervisor Doe #1 discriminated against Sean Harris for his mental health disabilities by seizing and detaining, him, and using excessive force against him. Defendants treated Sean Harris as a criminal suspect when they knew, or should have known, of his disabilities and that they required reasonable accommodations.

## FOURTH CLAIM FOR RELIEF

*(Supervisory Liability Against Police Supervisor Doe #1 for Violation of Rights Under 42 U.S.C. Section § 1983 Under the Fourth and Fourteenth Amendments)*

149. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

150. As set forth herein, Police Supervisor Doe # 1 directly and personally participated in and supervised Police Officers Doe #1-60 in the violations of the Fourth and Fourteenth Amendments against Sean Harris.

151. Police Supervisor Doe # 1 acted with reckless disregard and deliberate indifference in his supervision of the Town of Clarkstown police officers under his supervision at the scene, including failing to develop and implement a plan for de-escalation.

152. As a direct and proximate result of said Defendant's failure to supervise his subordinates, and his own direct participation in the underlaying events, Sean Harris sustained the damages alleged herein.

## STATE LAW CLAIMS FOR RELIEF

## FIFTH CLAIM FOR RELIEF

*(For Assault and Battery)*

153. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

154. Defendants Police Officers Doe #1-60 and Police Supervisor Doe # 1, while acting in the scope of their employment, without just cause or provocation, placed Sean Harris in fear of an imminent battery by surrounding his home with numerous police officers who were

equipped with various types of weapons and tools and failed to intervene when Police Officer Doe #1 shot him with a less lethal shotgun.

155. Defendant Police Officer Doe #1, while acting in the scope of his employment, without just cause or provocation or cause, deliberately discharged a less lethal shotgun in the direction of Mr. Harris, thereby striking him in the abdomen with a bean bag pellet(s).

156. As a result of the aforementioned actions, Police Officer Doe #1 committed a battery by intentionally discharging the weapon at Sean Harris, striking him, shattering the glass door has standing by, and thereby causing Mr. Harris to experience an offensive contact with the bean bag pellet(s) and glass.

## SIXTH CLAIM FOR RELIEF

(Intentional Infliction of Emotional Distress)

157. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

158. Defendants Police Officers Doe #1-60 and Police Supervisor Doe #1, acting in the scope of their employment, caused Sean Harris severe emotional distress by their extreme and outrageous conduct.

159. The Defendants' conduct caused Sean Harris to be detained in his home, to believe he could not safely leave his home, to fear for his life and was a proximate cause of his death.

## SEVENTH CLAIM FOR RELIEF

(Conscious Pain and Suffering)

160. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

161. Defendants Police Officers Does #1-60 and Police Supervisor Doe # 1, acting in the scope of their employment and without just cause or provocation, used force against Sean Harris. The use of such force was not justified under the circumstances and constituted unreasonable and unnecessary force.

162. The use of force did not immediately cause Sean Harris's death. As a result, he suffered and experienced a fear of impending death, severe emotional distress, and conscious pain and suffering.

## EIGHTH CLAIM FOR RELIEF

(False Imprisonment)

163. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

164. Police officers #1-60 and Police Supervisor #1 did falsely and wrongfully imprison Sean Harris when they intentionally confined him in his home by means of an overwhelming display of force and wrongful use of excessive force. Sean Harris's words and actions show he was conscious of his confinement and did not consent to the confinement.

165. The confinement was not otherwise privileged.

## NINTH CLAIM FOR RELIEF

(Negligence Against All Defendants)

166. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

167. As more fully discussed below, Plaintiff alleges that all Defendants owed Sean Harris a duty of care, breached said duty and thereby caused him damages.

168. With respect to the policer officer defendants, based on their actions in surrounding his home, and preventing his mother from re-entering the home, said defendants had detained Sean in his home without cause, thereby creating a duty of care as he had been placed in fear for his life by the overwhelming police presence. As a result of the foregoing, the police defendants created a special relationship with Sean Harris and a duty to protect him from harm.

169. The discharge of the weapon at Sean Harris increased his fear of the police and was a breach of the duty of care they owed Sean due to the special relationship they had created.

170. The police actions aforementioned proximately caused Sean to experience severe emotional distress that led to his death.

171. With respect to Jane Does 1-2, they too owed Sean Harris a duty of care as they were present in his home to check on his well-being and to provide counselling to him, as needed.

172. Said defendants breached that duty of care by calling for an unwarranted police response to Sean's home. They also breached said duty by failing to communicate any of their concerns to his mother before or after calling the police. Said defendants also breached their duty to Sean by leaving the scene while his home was surrounded by up to 60 police officers with multiple weapons.

173. As a direct and proximate result of the negligence of said caseworkers, Sean experienced severe emotional distress that led to his death.

174. The actions or inactions of all Defendants were within the scope of their employment, and therefore, their respective employers are liable under *respondeat superior.*

175. With respect to the Defendant EMTs McHugh and Latanzio, and Paramedic Defendants Does #1-2, said Defendants had a duty of care to Sean Harris.

176. Said Defendants breached their duty by failing to adequately and promptly provide medical attention and delayed the transport of Sean Harris to the hospital.

177. The breach of said duty of these Defendants was a proximate cause of Sean Harris's death.

## PUNITIVE DAMAGES

178. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

179. The acts of Defendants Police Officers Does #1-60 and Police Supervisor Doe # 1 were willful, wanton, malicious and oppressive and were motivated solely by the desire to harm Sean Harris without regard for his well being and were based on a lack of concern and ill-will towards him. Such acts therefore warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and relief against the Defendants as follows:

a. Compensatory damages:

b. Punitive damages in an amount to be determined at trial;

c. An award of the costs and expenses of this action including attorney's fees to the Plaintiff pursuant to 42 U.S.C. § 1988; and

d. Any such other and further relief as this Court may deem appropriate.

**A JURY TRIAL IS DEMANDED**

DATED: New York, New York
July 8, 2024

NEWMAN FERRARA LLP

By: /s/ Debra S. Cohen
Debra S. Cohen
dcohen@nfllp.com
Randolph M. McLaughlin
rmclaughlin@nfllp.com
1250 Broadway, 27th Floor
New York, New York 10001
Tel.: (212) 619-5400
Fax: (212) 619-3090