USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/22/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN ADAMS, AS THE ADMINISTRATOR OF THE ESTATE OF SEAN HARRIS,

Plaintiff,

–against–

TOWN OF CLARKSTOWN, et al.,

Defendants.

No. 24-cv-05147

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Kevin Adams ("Plaintiff"), as administrator of the Estate of Sean Harris ("Mr. Harris"), brings this action against the Town of Clarkstown; Rockland County; Police Chief Jeffrey Wannamaker; Detective Lieutenant Thomas Ronan; Lieutenant Kieran Dwyer; Sergeant Alice Laschet; Sergeant Kevin Shea; Sergeant William Robinson; Sergeant Robert McDonald; Police Officer Victor Carabello; Police Officer Kyle McKiernan (collectively, the "Clarkstown Defendants"); Access Caseworker Maureen Hyatt; Access Caseworker Claritza Morales; J. Williamson; and Access Supports for Living (Care Team) (collectively, the "Access Defendants") (together, "Defendants"), alleging violations of Mr. Harris's rights, privileges, and immunities secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, and the Constitution and laws of the State of New York.

Before the Court is Plaintiff's motion to file a Second Amended Complaint to incorporate newly discovered information obtained from a production of documents by the Access: Supports for Living Defendants on March 25, 2026. (Pl. Mem. at 1.)[1] (ECF No. 160) For the reasons set forth below, Plaintiff's motion is GRANTED in part and DENIED in part.

**FACTUAL BACKGROUND**

The following facts are derived from the First Amended Complaint (ECF No. 64.) and the Plaintiff's Memorandum of Law in Support of Filing a Second Amended Complaint, (ECF No. 160.) At this stage, Plaintiff's allegations are taken as true and construed in the light most favorable to Plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Sean Harris's mother, Judy Adams, had contacted Access to set up home visits to provide support services for her son. (FAC ¶ 29.) On May 30, 2023, at around 6:15 p.m. Defendants Maureen Hyatt and Claritza Morales, caseworkers employed by Access, arrived at Sean Harris's home for a visit. (*Id*. at ¶ 27-28.) This was the third home visit by the agency. (*Id*. at ¶ 30.) It was the first time either Hyatt or Morales had been there and had met Sean or Ms. Adams. (*Id*. at ¶ 31.) Once the two caseworkers arrived, they went downstairs to the basement where Mr. Harris was playing video games. (*Id*. at ¶ 27, 40.) Ms. Adams was watching the conversation from the top of the stairs. (*Id*. at ¶ 41.) The caseworkers spent less than a minute with Mr. Harris and then returned upstairs. (*Id*. at ¶ 42.) Mr. Harris, Ms. Adams, and the two caseworkers came upstairs and sat on two couches. (*Id*. at ¶ 42-44.) Mr. Harris was holding a "T-Ball" bat in his hand and the conversation between him and Ms. Adams was normal, although they disagreed about whether she should pay for a new phone for him. (*Id*. at ¶ 47-49.) During this time, the two caseworkers had left the house and made a phone call while standing in the front yard. (*Id*. at ¶ 51-52.) Shortly

[1] The Court refers to the parties' motion papers as follows: (1) ECF No. 160 ("Pl. Mem."); (2) ECF No. 166 ("Town Defs.' Opp."); (3) ECF No. 168 ("Access Defs.' Opp."); (4) ECF No. 171 ("Rockland County Def Opp.")

after, the police officers from the Defendant Town arrived at the house and were met by Hyatt and Morales. (*Id*. at ¶ 53, 67.) Mr. Harris and Ms. Adams then came to the front door. (*Id*. at ¶ 68.) One of the officers asked Ms. Adams to come outside, so she did, while Mr. Harris remained by the front door of the house. (*Id*. at ¶ 69.) The police had been to the house before when Ms. Adams was concerned about her son's well-being. Each time the police had visited, Mr. Harris was cooperative with them. (*Id*. at ¶ 54-56.) On a few occasions Mr. Harris was taken to and treated at local psychiatric facilities to stabilize his condition, but usually the police would speak to him and leave. (*Id*. at ¶ 57-58.)

After Ms. Adams stepped outside the home, the police did not allow her to return inside. (*Id*. at ¶ 71-72.) Ms. Adams advised officers that Mr. Harris was not violent and had not harmed anyone. (*Id*. at ¶ 73.) She was kept outside the house while Mr. Harris remained inside. (*Id*. at ¶ 74.) Ms. Adams also informed police that there were no firearms in the home. (*Id*. at ¶ 75.) She further advised officers of Mr. Harris's mental-health issues and the medications he took. (*Id*. at ¶ 76.) Additional police cars and officers thereafter arrived at the scene. (*Id*. at ¶ 77.) Police put up yellow crime scene tape and positioned officers around the residence and in neighboring yards. (*Id*. at ¶ 78-79.) Eventually, as many as sixty to seventy officers, including members of the Clarkstown Police Department's CIRT entry team, responded to the scene. (*Id*. at ¶ 80.) Defendant Kyle McKiernan was among the first officers to arrive and initially communicated with Sean. (*Id*. at ¶ 81.) At some point thereafter, McKiernan displayed his duty handgun, as did at least one other officer. (*Id*. at ¶ 82.) Other officers displayed CEW's (Tasers). (*Id*. at ¶ 84.) Defendant Sgt. William Robinson arrived at the scene at approximately 6:29 p.m., Sgt. Shea arrived shortly after, and P.O. J. Williamson arrived at the scene at approximately 6:24 p.m. (*Id*. at ¶ 89-91, 97). Sgt. Shea asked P.O. J Williamson to help him prepare the beanbag shotgun. (*Id*. at ¶ 98-99.) Sgt. Shea then loaded the rounds into the less lethal shotgun and positioned himself crouched behind a car.

(*Id*. at ¶ 100.) Sgt. Shea fired the less lethal shotgun, without warning, and one projectile struck Mr. Harris in the abdomen and another shattered the glass storm door behind him. (*Id*. at ¶ 101-102, 107.) Mr. Harris then retreated into the house and closed the front door. (*Id*. at ¶ 116.)

Mr. Harris could be seen through the windows of the house as he was walking around holding a water bottle. (*Id*. at ¶ 117-118.) P.O. McKiernan continued to ask him to come out of the house and one of Mr. Harris's relatives was given a device to talk to him, however he said he would not come out. (*Id*. at ¶ 121-125.) When the police asked Mr. Harris to come outside at one point he said, "it's too late for that." (*Id*. at ¶ 126.) Caseworkers Hyatt and Morales left while Mr. Harris was visible walking inside the house. (*Id*. at ¶ 127.) They both admitted to the police they did not know much about Mr. Harris and his mental health conditions, and they made no attempt to communicate with Mr. Harris from when they left the house. (*Id*. at ¶ 128-129.) Defendant Lt. Kieran Dwyer monitored the incident by police radio and arrived at the scene at approximately 7:01 p.m., where he was briefed by Sergeants Robinson and Shea. (*Id*. at ¶ 130-34.) Defendant Sgt. Alice Laschet, a Clarkstown police negotiator, also arrived at the scene and served as Defendant P.O. Victor Carabello's negotiation coach after Carabello took over communications with Sean. (*Id*. at ¶ 135, 140-41.) Carabello observed that Sean appeared despondent. (*Id*. at ¶ 142.) At approximately 7:07 p.m., several officers and supervisors, including Dwyer, Laschet, Robinson, Shea, and Carabello, received an email advising them of a March 31, 2022, incident in which Mr. Harris had been taken to the emergency room after appearing despondent and swallowing bleach. (*Id*. at ¶ 143-44.) Police thereafter delivered a throw phone into the residence at approximately 7:40 p.m. and attempted to contact Mr. Harris by phone and text message for approximately one hour without response. (*Id*. at ¶ 145-50.) Police Chief Jeffrey Wanamaker and CIRT entry team entered the residence at approximately 9:03 p.m., and the CIRT entry team entered the residence at approximately 9:25 p.m., and after more than an hour without contact with

Mr. Harris. (*Id*. at ¶ 151-54.) Officers found Mr. Harris unresponsive in the bathroom near pill bottles. (*Id*. at ¶ 155.) Mr. Harris was removed from the residence and transported to the hospital at approximately 9:45 p.m., where he was later pronounced dead. (*Id*. at ¶ 161-69.) According to the hospital records, Mr. Harris arrived at the hospital in cardiac arrest, pupils fixed and dilated, no spontaneous respiration and neurologically unresponsive. (*Id*. at ¶ 170.) Hospital records reflected an abrasion on Mr. Harris's lower left abdomen consistent with the reported impact of a beanbag shotgun projectile. (*Id*. at ¶ 171-72.) Mr. Harris was pronounced dead at the hospital at approximately 10:23 p.m. (*Id*. at ¶ 173.) When family members later returned to the residence, they observed no indication that Mr. Harris had damaged or destroyed items in the home, aside from some moved furniture and a missing dining room chair. (*Id*. at ¶ 174-75.) The medicine cabinet and bathroom shelf appeared orderly, and nothing was on the bathroom floor. (*Id*. at ¶ 176-77.) Police had searched the residence before Mr. Harris was transported to the hospital and before the family was permitted to reenter. (*Id*. at ¶ 178.) Ms. Adams was not advised what, if any, items police removed from the residence or from Mr. Harris at the hospital. (*Id*. at ¶ 179-80.)

**PROCEDURAL HISTORY**

Plaintiff commenced this action on July 9, 2024. (ECF No. 11.) Rockland County filed its Answer on August 19, 2024 (ECF No. 20) and the Town of Clarkstown filed its Answer on September 12, 2024 (ECF No. 31.)

On December 13, 2024, Access Supports for Living and Access Caseworkers Jane Does #1-2 (the "Access Defendants") filed a motion to dismiss the original Complaint. (ECF No. 37.) Plaintiff filed an opposition (ECF No. 38.) While the motion was pending, Plaintiff sought leave to amend the Complaint. (ECF No. 55.) On June 12, 2025, the Court granted Plaintiff leave to amend and denied the Access Defendants' pending motion to dismiss as moot, without prejudice

to renewal. (ECF No. 60.) Plaintiff then filed the operative First Amended Complaint ("FAC") on July 9, 2025. (ECF No. 64.)

On July 24, 2025, the Town of Clarkstown and certain individual Clarkstown defendants filed an Answer to the FAC. (ECF No. 119.) That same day, the Access Defendants and Rockland County each sought leave to move to dismiss the FAC. (ECF Nos. 120, 121.) Plaintiff opposed those requests. (ECF Nos. 125, 126.) On August 1, 2025, the Court waived the pre-motion conference requirement, granted the Access Defendants and Rockland County leave to move to dismiss, and set a briefing schedule. (ECF No. 127.)

The motions to dismiss the FAC were fully briefed on November 14, 2025. The Access Defendants filed their motion to dismiss at ECF No. 132; Plaintiff filed an opposition at ECF No. 133; the Clarkstown Defendants filed an opposition to Access Defendants' motion to dismiss at ECF No. 136; and the Access Defendants filed a reply at ECF No. 137. Rockland County separately filed its motion to dismiss at ECF No. 142, Plaintiff filed an opposition at ECF No. 144, and Rockland County filed its reply at ECF No. 143.

After the motions to dismiss were fully briefed, the Court held a telephone conference on April 17, 2026. At that conference, the Court granted Plaintiff leave to move to amend the pleadings as to the Access Defendants and directed that the Access Defendants' pending motion to dismiss be held in abeyance pending resolution of Plaintiff's motion to amend. On July 16, 2026, Plaintiff filed the instant motion for leave to file a Second Amended Complaint, together with a memorandum of law and supporting declaration. (ECF Nos. 159, 160, 164.) The Clarkstown Defendants filed a memorandum of law in opposition. (ECF No. 166.) The Access Defendants likewise opposed the motion. (ECF No. 168.) Rockland County filed its memorandum of law in opposition at ECF No. 171. Plaintiff thereafter filed a reply memorandum and reply affirmation in further support of its motion. (ECF Nos. 169–70.)

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 15(a)(2)

A party may amend a pleading once as a matter of course or at any time before trial with leave of the court. Fed. R. Civ. P. 15(a)(1)-(2). If a party seeks leave to amend a pleading, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Nonetheless, "[r]easons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' ")).

Whether leave to amend is given freely or for good cause, if the statute of limitations has run on the claims asserted in the pleading, then an amendment that "changes the party or the naming of the party against whom a claim is asserted" must be found to "relate[ ] back to the date of the original pleading" in order to be timely. Fed. R. Civ. P. 15(c); *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 550 (2010) ("relation back ... balance[s] the interests of the defendant protected by the statute of limitations with the preference ... for resolving disputes on their merits").

## DISCUSSION

Plaintiff seeks to amend the First Amended Complaint in several ways: (1) to incorporate newly discovered factual allegations based on the Access Defendants' March 25, 2026 document production in support of Plaintiff's existing negligence claim; (2) to add the Access Defendants and Rockland County to Plaintiff's Fourteenth Amendment substantive due process claim; (3) to

add the Access Defendants and Rockland County to Plaintiff's claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act; (4) to assert a wrongful-death claim against all Defendants. As explained below, neither undue delay nor prejudice warrants denial of leave to amend, and the Court therefore considers whether each proposed amendment would be futile.

**I. Undue Delay**

In the Second Circuit, "[m]ere delay, [ ] absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981); *see also Parker v. Columbia Pictures Industries*, 204 F.3d 326, 339 (2d Cir.2000) ("[W]e have held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion ...."). Where a significant period of time has passed prior to filing a motion to amend, however, the moving party must provide an explanation for the delay. *See Park B. Smith, Inc. v. CHF Industries Inc.*, 811 F.Supp.2d 766, 779 (S.D.N.Y.2011) (describing burden to explain extended delay and collecting cases).

Here, Plaintiff explains that the reasoning behind seeking leave to file a Second Amended Complaint in this matter is to incorporate newly discovered information obtained from a production of documents by the Access: Supports for Living Defendants on March 25, 2026. (Pl. Mem at 1.) The documents were produced by Access to all parties on that date in response to a Request for Production served by the Town of Clarkstown Defendants on October 24, 2025. *See Friedl v. City of New York*, 210 F.3d 79, 88 (2d Cir. 2000) (finding no undue delay where "the amendment was proposed only after discovery revealed additional relevant facts")

**II. Prejudice**

Although "[p]rejudice to the opposing party ... has been described as the most important reason for denying a motion to amend," *Frenkel v. New York City Off–Track Betting Corp.*, 611

F.Supp.2d 391, 394 (S.D.N.Y. 2009) (quoting *Turkenitz v. Metromotion, Inc*., 97 Civ. 2513, 1997 WL 773713, at *8 (S.D.N.Y. Dec. 12, 1997)), only undue prejudice warrants denial of leave to amend, *A.V. by Versace, Inc. v. Gianni Versace S.p.A*., 87 F.Supp.2d 281, 299 (S.D.N.Y.2000); *see also Oneida Indian Nation of New York State v. County of Oneida*, 199 F.R.D. 61, 77 (N.D.N.Y.2000) (noting that where moving party provides explanation for delay, opposing party must make "greater showing" of prejudice).

In deciding whether such prejudice exists, courts evaluate whether the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Monahan v. New York City Department of Corrections*, 214 F.3d 275, 284 (2d Cir.2000) (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir.1993)). Courts also consider the particular procedural posture of the case. *See*, *e.g*., *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir.2008) ("Undue prejudice arises when an 'amendment [comes] on the eve of trial and would result in new problems of proof.'" (alteration in original) (quoting *State Teachers Retirement Board*, 654 F.2d at 856)); *Grochowski v. Phoenix Construction*, 318 F.3d 80, 86 (2d Cir.2003) (upholding denial of leave to amend sought after discovery had closed and while summary judgment motion was pending). This "inquiry involves a balancing process," weighing any potential prejudice to the opposing party against the prejudice that the moving party would experience if the amendment were denied. *Oneida Indian Nation of New York*, 199 F.R.D. at 77. The non-moving party bears the burden "of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *Id*.; *see also ResQNet.com v. Lansa, Inc*., 382 F.Supp.2d 424, 449 (S.D.N.Y.2005), *rev'd on other grounds*, 594 F.3d 860 (Fed.Cir.2010).

Here, Defendants will not be required to expend significant resources to conduct discovery, the parties are not yet preparing for trial, and there is no indication that amendment would significantly delay the resolution of this action. Since the proposed amendments concern the same underlying events already at issue, Defendants have not shown that they would suffer substantial prejudice if leave to amend is granted. Accordingly, prejudice does not provide a basis to deny Plaintiff's motion.

**III. Futility**

"It is well established that '[l]eave to amend need not be granted ... where the proposed amendment would be futil[e].'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir.2011) (alterations in original) (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir.1997)). To determine whether a proposed pleading is futile, courts analyze whether it would withstand a motion to dismiss. *See AEP Energy Services Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 726 (2d Cir.2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact."). Accordingly, the plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As when considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor.

The amendments cure some factual specificity deficiencies and the Court considers each proposed amendment in turn.

**IV. Proposed Amendments to Plaintiff's Negligence Claim**

First, Plaintiff seeks leave to amend the existing negligence claim against the Access Defendants to incorporate additional factual allegations derived from documents produced by Access during discovery. (Pl. Mem. at 3-5.) The Amended Complaint already alleges that

Defendants Hyatt and Morales owed Sean Harris a duty of care arising from their role as mental-health caseworkers, breached that duty by summoning police, failing to communicate with Ms. Adams, and leaving the scene, and that their alleged negligence contributed to Harris's death. (FAC ¶¶ 221-23.)

However, the proposed Second Amended Complaint supplements that existing theory with additional allegations concerning the information available to Access and Hyatt before the incident, including Harris's treating providers, prior suicidal conduct, and prior successful efforts by Access caseworkers to de-escalate and engage him. (Proposed SAC ¶¶ 59-76, 126-31.) Plaintiff further alleges that Hyatt failed to convey relevant information to police or suggest contacting Harris's treating providers, that Access did not contact those providers during the standoff, and that Hyatt and Morales left the scene without a Behavioral Health Response Team in place. (Proposed SAC ¶¶ 132-40, 297-301.) Plaintiff also alleges that, following the incident, Access stated that it would work with the BHRT to determine how best to "handoff" cases when the CARE Team was transitioning off shift. (Proposed SAC ¶¶ 245-47.)

These allegations concern the same May 30, 2023, events already at issue and merely provide additional factual support for Plaintiff's existing negligence theory. *See Vega v. Fox*, 457 F. Supp. 2d 172, 187 (S.D.N.Y. 2006) (relationship between social services providers and "disabled young adults" that they are helping that imposes duty to protect from conduct of others to the extent reasonable under the circumstances). The motion was made in a timely fashion, and Plaintiff's motivation is to incorporate newly acquired information from the Defendants into the pleadings. Moreover, the Court discerns no basis to conclude that the proposed amendments are futile. Accordingly, Plaintiff's motion for leave to amend the negligence claim is GRANTED.

## V. Proposed Extension of the Fourteenth Amendment Substantive Due Process Claim to Additional Defendants

**a. Access Defendants**

To state a claim under § 1983 for a violation of substantive due process, Plaintiff must plausibly allege that the challenged conduct is attributable to the State. In *Sybalski v. Indep. Grp. Home Living Program, Inc.,* the Second Circuit explained that the conduct of a nominally private entity may be attributed to the State where: (1) the entity acts pursuant to the State's coercive power or is controlled by the State; (2) the State significantly encourages the challenged conduct, the private entity willfully participates in joint activity with the State, or the entity's functions are entwined with state policies; or (3) the State has delegated to the private entity a function traditionally and exclusively reserved to the State. 546 F.3d 255, 257 (2d Cir. 2008). The Second Circuit further emphasized that it is not enough to allege governmental involvement in "some activity" of the private entity; rather, the plaintiff must allege that the State was involved "with the activity that caused the injury giving rise to the action." *Id*. at 257-58.

The state-action inquiry is conduct specific. The focus is not whether Access may be characterized as a state actor generally by virtue of its contractual relationship or operational relationship with Rockland County, but whether the particular conduct alleged to have caused the constitutional deprivation is fairly attributable to the State. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (requiring that the "conduct allegedly causing the deprivation" be fairly attributable to the State); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974) (requiring a sufficiently close nexus between the State and the "challenged action" of the private entity). Thus, "[i]t is not enough. . . for a plaintiff to plead state involvement in 'some activity' of the institutional alleged to have inflicted injury"; rather, the plaintiff must allege that the State was involved "with the activity that caused the injury." *Sybalski*, 546 F.3d at 257-58.

Here, although the Proposed Second Amended Complaint adds allegations concerning Access's contractual and operational relationship with Rockland County, those allegations concern

the County's general oversight of Access's provision of mental-health services and do not plausibly connect the County to the particular conduct alleged to have caused Harris's constitutional injury. Plaintiff alleges, among other things, that Rockland County contracted with Access to provide services to individuals referred by the County's Behavioral Health Response Team, that Access was required to submit monthly program reports to the Rockland County Department of Mental Health, and that Access was not entitled to payment unless the County determined that the services rendered were acceptable. (Proposed SAC ¶¶ 34–49.) However, Plaintiff does not allege that Rockland County directed, controlled, or significantly encouraged Hyatt and Morales's decision to summon the police; directed or participated in their communications with responding officers; instructed them not to communicate Harris's mental-health history or the identities of his treating providers; directing their decision not to contact those providers; or instructed them to leave the scene. Plaintiff also does not allege that any Rockland County employee participated in those decisions. Accordingly, the allegations concerning the County's contractual relationship with and general oversight of Access do not plausibly establish the requisite nexus between the State and the specific conduct giving rise to Plaintiff's substantive due process claim.

Accordingly, the proposed amendments therefore do not plausibly allege that the challenged conduct of the Access Defendants was fairly attributable to the State and thus does not cure the state-action deficiency. The proposed amendment would accordingly fail to withstand a motion to dismiss under Rule 12(b)(6). *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) ("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) . . . ."). Plaintiff's request for leave to assert a Fourteenth Amendment substantive due process claim against the Access Defendants is therefore DENIED as futile.

**b. Rockland County**

A municipality may be held liable under 42 U.S.C. § 1983 only where the alleged constitutional deprivation was caused by a municipal policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658, 691–94 (1978). A plaintiff may establish the existence of such a policy or custom by alleging: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010).

Here, the Proposed Second Amended Complaint does not allege that the purposed violation of Harris's constitutional rights resulted from any Rockland County policy or custom. Plaintiff does not identify any County policy that directed or caused the challenged conduct, any action or decision by a final County policymaker, any persistent or widespread practice, or a failure to train or supervise amounting to deliberate indifference. Rather, to the extent Plaintiff seeks to impose liability on Rockland County based solely on the conduct of County employees involved in the underlying incident, such allegations are insufficient to state a claim under *Monell*. Accordingly, Plaintiff's request for leave to assert a Fourteenth Amendment substantive due process claim against Rockland County is DENIED as futile.

## VI. Proposed Extension of the Title II ADA Claim to Additional Defendants

### a. Access Defendants

Plaintiff's proposed ADA claim is legally insufficient since it is premised on a purported violation of the Title II of the Americans with Disabilities Act, codified at 42 U.S.C. § 12132. Title

II applies exclusively to public entities, which the statute defines as "[s]tate or local government, any department, agency, special purpose district, or other instrumentality of a State or States of local government, and the National Railroad Passenger Corporation and any commuter authority." 42 U.S.C. § 12131(1)(A-C). The receipt of federal funding does not transform a private entity into a public entity for purposes of Title II.

Here, Plaintiff's proposed Title II claim against Access is futile because Access is not a "public entity" within the meaning of the ADA. Plaintiff alleges that Access is a private nonprofit corporation that contracted with Rockland County to provide crisis-intervention services. That contractual relationship, however, does no transform Access into an instrumentality of the County. In *Green v. City of New York*, the Second Circuit held that a private entity does not become a "public entity" under Title II merely because it contracts with a municipality to provide services that the municipality is obligated to provide. 465 F.3d 65, 78–80 (2d Cir. 2006). Rather, the term "instrumentality" in § 12131 refers to a governmental unit or an entity created by a governmental entity. *Id.* Because Access is alleged to be a private nonprofit corporation rather than an entity created by or constituting a government entity, Access is not subject to liability under Title II. Accordingly, Plaintiff's request to amend the FAC to assert a Title II claim against Access is DENIED as futile.

Plaintiff's proposed claims against Access Caseworkers Maureen Hyatt and Claritza Morales under Title II and § 504 are likewise futile to the extent they are asserted against Hyatt and Morales in their individual capacities. The Second Circuit has expressly held that "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. SUNY Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Accordingly, Plaintiff's request to assert claims against Hyatt and Morales individually under Title II of the ADA or § 504 of the Rehabilitation Act is DENIED as futile.

**b. Rockland County**

Plaintiff's proposed Title II claim against Rockland County, however, is not futile. Unlike Access, Rockland County is a local government and therefore constitutes a "public entity" within the meaning of Title II. See 42 U.S.C. § 12131(1)(A). Moreover, a public entity's obligations under Title II extend to services provided "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b)(1). Thus, the fact that Rockland County contracted with Access, a private entity, to provide crisis-intervention services does not insulate the County from its own obligations under Title II.

At this stage, Plaintiff has plausibly alleged a failure-to-accommodate theory. The proposed SAC alleges that Rockland County contracted with Access to operate the CARE Team/MRSS in partnership with the County's BHRT and that Access operated the program under the County's direction and control. (Proposed SAC ¶¶ 23–24.) It further alleges that BHRT screened requests for services and referred appropriate cases to Access, that Access was designated as a County crisis-intervention provider, and that Access was required to submit monthly reports to the County Department of Mental Health. (*Id*. ¶¶ 33–49.) With respect to Harris specifically, Plaintiff alleges that the Access caseworkers left the scene without calling for a replacement from Access or BHRT, and that, following the incident, Access stated that it would work with BHRT to determine how best to "handoff" cases when the CARE Team was transitioning off shift. (*Id*. ¶¶ 207, 245–47.) These allegations, taken as true, plausibly support Plaintiff's theory that Rockland County failed to reasonably accommodate Harris's disability in the provision of its crisis-intervention services. *See* Proposed SAC ¶¶ 267–70. Courts in this District have permitted similar Title II claims involving an alleged failure to reasonably accommodate individuals experiencing mental-health crises. *See Felix v. City of New York*, 344 F. Supp. 3d 644, 663–66 (S.D.N.Y. 2018). Accordingly, Plaintiff's proposed Title II claim against Rockland County is GRANTED.

## VII. Proposed Extension of the Section 504 Rehabilitation Act Claim to Additional Defendants

### a. Access Defendants

The proposed § 504 claim against Access fails for a different reason. Unlike Title II of the ADA, § 504 of the Rehabilitation Act is not limited to public entities. Rather, § 504 applies to a "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim under § 504, a plaintiff must allege, inter alia, that the benefit at issue is part of a program or activity receiving federal financial assistance. *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). Although a private entity may fall within § 504 if it receives federal financial assistance, either directly or indirectly, *see T.W. v. Bd. of L. Exam'rs*, 996 F.3d 87, 97–98 (2d Cir. 2021), Plaintiff does not allege that Access or its CARE Team receives any federal financial assistance. Plaintiff alleges only that Access is a private nonprofit corporation that contracted with Rockland County to provide crisis-intervention services. That contractual relationship, without more, does not plausibly establish that Access is a recipient of federal financial assistance. *See Collins v. Giving Back Fund*, No. 18 Civ. 8812 (CM), 2019 WL 3564578, at *10–12 (S.D.N.Y. Aug. 6, 2019). Accordingly, Plaintiff's proposed § 504 claim against Access is DENIED as futile.

### b. Rockland County

Section 504 applies only to a "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). The proposed SAC does not allege that Rockland County's Department of Mental Health, the BHRT, or the relevant crisis-intervention program received federal financial assistance. Accordingly, notwithstanding the similarity between the substantive standards governing Title II and § 504, Plaintiff has failed to plead an essential element of a § 504 claim against Rockland County. Plaintiff's request for leave to assert that claim is therefore DENIED as futile.

## VIII. Proposed Wrongful Death Claim

Plaintiff seeks leave to assert a wrongful death claim against all Defendants. Under New York law, a personal representative of a decedent who is survived by distributees may maintain an action to recover damages for a "wrongful act, neglect or default" that caused the decedent's death against a person who would have been liable to the decedent had death not ensued. N.Y. Est. Powers & Trusts Law ("EPTL") § 5-4.1(1). The "essence" of a wrongful death claim is "that the plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Case* v. *Anderson*, No. 16-CV-983 (NSR), 2017 WL 3701863, at *20 (S.D.N.Y. Aug. 25, 2017) (citation omitted). New York law also recognizes that "negligent tort-feasors may be liable for the wrongful death, by suicide, of a person injured by their negligence." *Fuller* v. *Preis*, 35 N.Y.2d 425, 427 (1974).

The Proposed Second Amended Complaint alleges that Sean Harris died because of Defendants' negligence, that his mother, Judy Adams, is his surviving next of kin, and that she suffered pecuniary injuries arising from her reasonable expectation that Harris would provide her with future financial assistance or support from future employment. (Proposed SAC ¶¶ 306–09.) Plaintiff therefore sufficiently alleges the elements relevant to the proposed wrongful death claim for purposes of the instant motion.

Access separately argues that amendment would be futile because the proposed wrongful death claim is untimely. Under EPTL § 5-4.1, a wrongful death action generally "must be commenced within two years after the decedent's death." EPTL § 5-4.1(1). *See Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 123–24 (2d Cir. 1991). Mr. Harris died on May 30, 2023. Thus, absent relation back, the limitations period expired on May 30, 2025. Access argues that because neither the original Complaint nor the First Amended Complaint asserted a wrongful death cause of action, the proposed claim, first asserted in July 2026, is time-barred.

In response, Plaintiff argues that the proposed wrongful death claim relates back to the filing of the original Complaint pursuant to Federal Rule of Civil Procedure 15(c)(1)(B). (Pl. Reply at 17–18.) Rule 15(c)(1)(B) provides that an amendment relates back to the date of the original pleading where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." The "central inquiry" is whether the original pleading gave the opposing party adequate notice of the matters raised in the amended pleading through "the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006). Where the facts alleged in the amended pleading arise out of the conduct alleged in the original complaint, relation back is appropriate. *Id.*

Here, the proposed wrongful death claim arises from the same conduct, transaction, and occurrence alleged in the original Complaint. The original Complaint was filed on July 9, 2024, well within two years of Harris's death, and asserted claims arising from the events of May 30, 2023, and Defendants' allegedly wrongful conduct preceding Harris's death. The proposed wrongful death claim does not depend on a separate incident or materially different set of operative facts. Rather, it alleges an additional form of liability arising from the same May 30, 2023, incident and the same alleged conduct that formed the basis of Plaintiff's original claims. Indeed, Plaintiff's Notice of Claim, served before commencement of this action, expressly identified wrongful death among the injuries and damages arising from the incident. Although the Notice of Claim does not itself determine whether Rule 15(c)(1)(B) is satisfied, it further undermines any suggestion that the nature of the alleged injury underlying the proposed claim is unrelated to the events already at issue in this litigation.

Accordingly, the original Complaint provided Defendants with adequate notice of the factual circumstances underlying the proposed wrongful death claim. The proposed claim therefore relates

back to the filing of the original Complaint under Rule 15(c)(1)(B) and is not barred by EPTL § 5-4.1's two-year limitations period. *See Slayton*, 460 F.3d at 228. Because the proposed wrongful death claim is adequately pleaded and is not time-barred, amendment would not be futile.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for leave to file a Second Amended Complaint GRANTED in part and DENIED in part.

Specifically, Plaintiff's motion is GRANTED insofar as Plaintiff seeks to: (1) supplement the negligence claim against the Access Defendants with the newly alleged facts; (2) assert a Title II ADA Claim against Rockland County; and (3) assert a wrongful death claim against all the Defendants. Plaintiff's motion is DENIED as futile insofar as Plaintiff seeks to: (1) assert a Fourteenth Amendment substantive due process claim against the Access Defendants and Rockland County; (2) assert a Title II ADA claim against Access and against Hyatt and Morales in their individual capacities; and (3) assert a claim under Section 504 of the Rehabilitation Act against Access, Hyatt and Morales in their individual capacities, and Rockland County.

Plaintiff is directed to file a Second Amended Complaint consistent with this Opinion and Order on or before October 14, 2026. Following the filing of the Second Amended Complaint, the Defendants shall have until November 6, 2026, to respond to the Second Amended Complaint. The Court will set a briefing schedule for any renewed motions to dismiss.

Considering the forthcoming Second Amended Complaint, Defendants' pending motions to dismiss the First Amended Complaint are DENIED as moot, without prejudice.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 132, 142, and 160.

SO ORDERED.

Dated: September 22, 2026
White Plains, NY

Nelson S. Román, U.S.D.J.